UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA LOPP #654488,

              Plaintiff,                               Hon. Robert J. Jonker

v.                                         Case No. 1:22-cv-1135

HEIDI WASHINGTON, et al.,

              Defendants.

_____/

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action by Plaintiff Joshua Lopp, a former prisoner currently on parole with the Michigan Department of Corrections (MDOC). Lopp, an adherent of the cultural group Nation of Gods and Earths (NOGE), alleges violations of his First Amendment free exercise rights, his Fourteenth Amendment equal protection rights, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a), based on events that occurred while Lopp was incarcerated at the Lakeland Correctional Facility (LCF) from 2020 to 2022. The remaining Defendants include LCF Chaplain Adam Hollingsworth, former MDOC Special Activities Coordinator (SAC) Steve Adamson, current SAC Adrian Dirschell, and MDOC Correctional Facilities Administration (CFA) Deputy Director Jeremy Bush.

Presently before me are Defendants Hollingsworth, Adamson, Dirschell, and Bush's Motion for Summary Judgment (ECF No. 126) and Lopp's Motion for Summary Judgment. (ECF No. 130.) For the following reasons, pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Court **GRANT** Defendants' Motion, **DENY** Lopp's Motion, and dismiss this action **with prejudice**.

## I.  Background

Lopp has been an adherent of NOGE cultural belief system since 2011. (ECF No. 127-3 at

PageID.1203.) One court has summarized NOGE's history and cultural practices as follows:

> The NGE was founded in 1964 by Clarence 13X, also known as "The Father," when he left the Nation of Islam (NOI) because he disagreed with the idea of worshipping another person, Master Fard Muhammad, the founder of the NOI. [Doc. 138-4 at ¶ 2: Pltf. Aff. I]. Aimed primarily at inner-city youth, Clarence 13X taught that each individual was "God" and emphasized the "knowledge of self" that was "gained through building (utilizing knowledge & growing)." [*Id.* at ¶ 4]. The NGE teaches that the Asiatic Black Man is the Original Man and that men are "Gods" and women are "Earths." [Doc. 138-5 at 4; Doc. 76-4 at ¶ 15]. White men are considered the "devil," although perhaps not irredeemably so. [Doc. 76-4 at 5; Doc. 138-5 at 5].
>
> There are several foundational lessons in the NGE, including 120°, Mathematics, Alphabets, 12 Jewels, and the 5% Anthem. [Doc. 138-4 at ¶ 5]. With these lessons and literature, NGE members "can build reality to gain insight with self and the world around them." [*Id.* at ¶ 6]. The 120° consists of lessons, or "degrees," which prompt NGE to look at the past, present, and future to get perspective. [*Id.* at ¶ 10]. By constantly being active mentally and physically, members "can eliminate the clouds of deception around them," which is symbolized at the center of the circle of the NGE flag. [*Id.* at ¶ 7]. The essential tenets of NGE are to constantly build, never accept defeat, and to strive toward perfection. [*Id.* at ¶ 8]. In this regard, NGE members are "always seeking to better himself or herself." [*Id.* at ¶ 7]. The NGE practice several days of fasting during the year, including on February 22 ("The Fathers Born day"), June 13 ("Show's Prove day"), the last Saturday in August ("Annual Family Day"), and October 11 ("Birthday of the Nation of Gods and Earths"). [*Id.* at ¶ 12].

*Greene v. Lassiter*, No. 1:19-cv-224, 2025 WL 320947, at *4 (W.D.N.C. Jan. 28, 2025.) The

foregoing is generally consistent with Lopp's descriptions of NOGE's "Divine God Centered

Culture" in his amended complaint and to MDOC officials during the period of time at issue. (ECF

No. 68 at PageID.438; ECF No. 117-6 at PageID.880 (stating that his NOGE culture teaches that

"the blackman is God," deems "intelligence as the highest ranking thing in existence," and uses

"supreme mathematics, 120 degrees, Alphabet (supreme), [a]ctual, and solar facts" as its

foundational lessons); ECF No. 127-2 at PageID.1181; ECF No. 127-3 at PageID.1201–02.)

Lopp alleges that group or congregate meetings, books, and dietary restrictions are a central part of the NOGE shared faith. (ECF No. 68 at PageID.440.) He alleges that Defendants violated his First Amendment free exercise rights by denying his applications to recognize NOGE as a religious group for purposes of allowing it to have group services, celebrate honor days, and purchase religious property, by denying his applications for a diet that accommodated his NOGE beliefs, and by retaining NOGE-related literature, such as the books *How to Hustle and Win* and *The Five Percenters*, on the MDOC's list of restricted publications. (*Id.* at PageID.444–48.) He further alleges that Defendants violated his right to equal protection by engaging in theological discrimination. (*Id.* at PageID.68–69.) Finally, Lopp alleges that Defendants violated RLUIPA by refusing "to give approval of NOGE recognition [which] prevented [Lopp] from fulfil[l]ing the tenets of NOGE[.]" (*Id.* at PageID.456.)

### A.    MDOC's Treatment of NOGE

For many years, the MDOC designated NOGE a Security Threat Group (STG). *See Carter v. Heyns*, No. 1:16-cv-1279, 2017 WL 9480166, at *1 (W.D. Mich. July 5, 2017), *report and recommendation adopted in part and rejected in part*, 2017 WL 4230567 (W.D. Mich. Sept. 25, 2017) (noting that the MDOC had "designated NOGE as a Security Threat Group (STG) because it was 'intolerant and subversive'") (citing *Cromer v. Braman*, No. 1:07-CV-009, 2009 WL 806919 at *9 (W.D. Mich. Mar. 25, 2009), *aff'd,* No. 09-1532, 2011 WL 5289606 (6th Cir. Nov. 1, 2011)). The MDOC discontinued NOGE's STG status in approximately 2011, apparently in response to an order issued in *Hardaway v. Haggerty*, No. 2:05-cv-70362 (E.D. Mich.). *See id.* at *2.[1]

---

[1] It is notable that even today, some prison systems still designate NOGE an STG. *See Jackmon v. New Jersey Dep't of Corrs.*, No. 18-149, 2025 WL 3079201 (D.N.J. Nov. 4, 2025) (New Jersey prison system).

MDOC Policy Directive 05.03.150 addresses prisoners' exercise of their religious beliefs and practices "within the constraints necessary for the safety, security and good order of the facility." Mich. Dep't of Corr. Policy Directive 05.03.150 (effective 10/01/2019). Under the policy, all prisoners are permitted to receive religious reading material from either the institutional chaplain or through the mail, subject to the prisoner mail policy, Policy Directive 05.03.118. *Id.*, HH. In addition, if applicable, all prisoners may receive "clergy" and "outreach volunteer" visits. *Id.*, ¶¶ YY, AAA.

The policy also provides for formal recognition of religious groups for purposes of conducting group religious services and activities and possessing authorized personal religious property. *Id.,* ¶ I. A prisoner or group of prisoners seeking recognition of a religion may submit a written request to the warden or warden's designee containing information about the group's beliefs and practices. The warden or designee transmits the request and all supporting documentation to the SAC for review through the appropriate chain of command, including the Chaplaincy Advisory Council (CAC), if necessary. *Id.*, ¶ K. The CAC is "comprised of representatives of various faiths and denominations [and] serves in an advisory capacity to the [MDOC] regarding religious policy and programming." *Id.*, ¶ G. With the exception of the SAC, all CAC members are outside volunteers. *Id.* The CFA Deputy Director makes the final determination as to religious recognition and whether group religious services and activities and personal religious property will be allowed. A group "shall be granted recognition if it is determined to be a bona fide religious group with beliefs and practices not adequately represented by an existing recognized religious group, based on any recommendation received from the CAC." *Id.*, ¶ L.

Prior to NOGE's removal from the STG list, the MDOC had received and denied prisoner requests for NOGE recognition for group services and activities. (ECF No. 117-6 at PageID.905, 911.) Following NOGE's removal from the STG list, the CAC reconsidered the request and recommended that it be denied. (ECF No. 117-6 at PageID.911.) In July 2014, CFA Deputy Director Finco denied additional requests for NOGE recognition, although NOGE adherents were still permitted to study NOGE's teachings on their own, receive NOGE correspondence and literature, and receive "clergy" and "outreach volunteer" visits. (*Id.* at PageID.900.) Over the next several years, prisoners submitted additional requests for NOGE recognition, including requests from Lopp in 2016, 2019, 2020, and 2022 (ECF No. 68 at PageID.444–48; ECF No. 117-6 at PageID.902), which the CAC recommended be denied because "the information provided contain[ed] photocopied documents and exact duplicates of prior requests," and "the requests d[id] not contain any new information, sufficient to support reconsideration of DD Finco's response." (*Id.* at PageID.911.) The CAC identified two primary concerns supporting its recommendations. First, both the applicants and their supporting materials eschewed the label "religion" to describe NOGE. (*Id.*; ECF No. 127-2 at PageID.1170 ("[W]e have been mis-defined as a religion, cult, offshoot, gang, group and organization. We are none of those things.").) The CAC noted that Lopp and the other applicants had identified NOGE as "a movement as opposed to a religion," which raised the issue about opening the door for other non-religious groups to seek group services. (ECF No. 117-6 at PageID.906.) Second, the CAC identified "security risks" stemming from NOGE's exclusion of "white people . . . because they're the devil." (*Id.*) This was contrary to the MDOC's policy, which precludes religious group restrictions based on "race, color, or nationality." Mich. Dep't of Corr. Policy Directive 05.03.150 ¶ P.

In 2022, the CAC's perception of NOGE began a paradigm shift when one member expressed disagreement with Deputy Director Finco's prior decision denying religious recognition and asked to present more information for the members' consideration. (*Id.* at PageID.911–12.) Consequently, the requests before the CAC, including Lopp's, were tabled pending receipt of additional information. (*Id.*) By the CAC's spring 2024 meeting, it "[h]a[d] everything [it] require[d] for a request." (ECF No. 127-6 at PageID.1245.) Based on this information, NOGE was recognized as a religious group in spring 2024, allowing it to hold group services and events and possess religious property. (ECF No. 127-7 at PageID.1252.)[2]

### B.    Lopp's Religious Diet Requests

Due to the cost of providing religious meals to many different religious groups, the MDOC has developed a regular diet with a daily non-meat option that allows prisoners to self-select for a vegetarian meal. Mich. Dep't of Corr. Policy Directive 05.03.150 ¶ NN. If the vegetarian option does not suffice to meet the prisoner's religious needs, the prisoner may request the religious diet, *i.e.*, the vegan menu, which is designed to accommodate as many religious beliefs as possible but is available only at designated facilities. A prisoner who believes that the vegan menu does not meet their religious dietary needs may request an alternate diet. *Id.* ¶ OO. To eat from the vegan menu, a prisoner must submit a request to the Warden or designee, who obtains information regarding the prisoner's request and religious beliefs and forwards it to the SAC for review and approval or denial. *Id.* ¶ PP. The CFA Deputy Director decides whether to approve an alternative menu request. *Id.* ¶OO.

---

[2] Mich. Dep't of Corr. Policy Directive 05.03.150, Attach. A (effective Mar. 26, 2025) https://www.michigan.gov/corrections/-/media/Project/Websites/corrections/Files/Policy-Directives/PDs-05-Institutional-Placement-and-Programs/PD-0503-Programs-and-Leisure-Time-Activities/05-03-150-Religious-Beliefs-and-Practices-of-Prisoners-effective-01-3-22.pdf?rev=ce180f3309374c5495bf753209c3f2f3.

Regardless of his religious designation, a prisoner still must request and be approved for the vegan menu and/or an alternate diet; the decision is based on the information the prisoner provides. (ECF No. 127-7 at PageID.1248–49.) Once a prisoner submits a request for approval, the Chaplain interviews the prisoner and assists with completing various forms, which are then forwarded to the SAC. (*Id.* at PageID.1248.) Records of the prisoner's store purchases are also considered to assess the need for a religious diet. (*Id.* at PageID.1250–51.) The MDOC previously allowed prisoners to request both types of diets (vegan and alternative) in a single request once per year, but now requires that prisoners first be approved for the vegan diet before seeking an alternative diet. (*Id.* at PageID.1249.)

Over the years, Lopp submitted religious and alternative diet requests and other communications providing conflicting information or suggesting that a vegetarian menu sufficed for NOGE adherents. Defendant Hollingsworth interviewed Lopp and provided all of the information to the SAC (Adamson or Dirschell) for processing. (ECF No. 127-8 at PageID.1256.) In 2018 and 2019, Lopp said that he needed to eat foods such as grains, fruits, and vegetables and avoid meat and meat byproducts, as well as "over processed foods and additives, i.e., sugars though natural sweeteners like honey are OK." (ECF No. 117-6 at PageID.877; ECF No. 127-2 at PageID.1161.) In November 2020, he wrote a letter to Director Washington stating that "[f]or three (3) years [he] strived to be placed on the <u>Vegan Diet</u>" in order to adhere to his NOGE cultural tenets, but closed by requesting that he and NOGE adherents "be provided <u>Vegetarian</u> meals the same as afforded all religious groups[.]" (ECF No. 117-6 at PageID.868.) The same year, Lopp submitted a NOGE recognition request supported by materials citing "no pork or pork by-products" as the only dietary restriction. (ECF No. 127-2 at PageID.1172, 1174, 1175.) In his 2021 application, Lopp said that in NOGE, "being vegan/vegetarian is fundamental," (ECF 117-6 at

PageID.887), whereas the following year he said that "[a] vegan or vegetarian diet is *preferred*." (ECF No. 172-2 at PageID.1181 (italics added).) In his 2023 request, Lopp stated that NOGE adherents should be "vegan or vegetarian," but "it may be necessary to eat meat" due to North America's weather. (ECF No. 127-2 at PageID.1183.) Lopp also said that many in his culture believe that "being vegan/vegetarian is better for the environment & our bodies," and that the father of NOGE "encouraged [adherents] to eat meat-free foods[.]" (*Id* at PageID.1179.) Lopp also suggested that he was required to follow "the strict diet . . . from the Nation of Islam's Elijah Muhammad" in his book *How to Eat to Live* (ECF No. 117-6 at PageID.887), which prohibits, among other things, "not only pork, pork byproducts, and soy, but also corn, beans (except navy beans), white rice, peanut butter, white potatoes, pasta, sugar, and essentially all processed foods." (ECF No. 127-7 at PageID.1251.) Lopp also submitted materials prohibiting "any form of dairy products." (ECF No. 127-2 at PageID.1187.)

Lopp's requests were denied because, based on his religious designation, representation of his cultural beliefs, and his commissary purchases, he did not need a religious vegan diet and the vegetarian option would meet his needs. (ECF No. 127-7 at PageID.1251.) However, in December 2024, Lopp was approved for religious vegan diet. (*Id.* at PageID.1252.)

### C.    NOGE Literature

Lopp alleges that on or about January 7, 2022, he received a mail rejection for the book *The Five Percenters* because it was on the MDOC's Restricted Publications List pursuant to Policy Directive 05.03.118. (ECF No. 68 at PageID.446.) On April 14, 2022, Lopp received a mail rejection for the books *How to Hustle and Win* and *The Wu Tang Manual* because they were also

on the Restricted Publications List.[3] (*Id.*) Lopp sought a hearing as to these rejections but was informed that no hearing is provided for books that have previously been restricted. (*Id.*) Lopp alleges that the rejected books are central to the NOGE tenets and his "God Centered Culture" (*id.*), and that "Defendants have used the restricted book list to suppress the NOGE theology and categorically ban materials central the NOGE doctrine [and deny access to theological literacy][,]" which "constitutes a complete denial." (*Id.* at PageID.447.) However, Lopp receives "all materials [he] need[s] to live out [his] God centered cultural tenets" from NOGE's national office. (ECF No. 117-6 at PageID.881.) Such materials include NOGE's national monthly newspaper, *The Five Percenter*, as well as NOGE's "foundational lessons," "supreme mathematics, 120 degrees, [and] Alphabet (supreme)." (*Id.* at PageID.878, 888; ECF No. 127-2 at PageID.1161.) Lopp has access to these and other NOGE cultural materials, and has studied his lessons "everyday" since before 2019. (ECF No. 117-6 at PageID.874, 878, 888; ECF No. 127-3 at PageID.1213–14.)

## II.   Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of

---

[3]*The Wu Tang Manual* has since been removed from the Restricted Publications List. (ECF No. 128-1 at PageID.1295.)

fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Where the moving party has the burden, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has emphasized that the party with the burden of proof "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561. Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### III.  Discussion

#### A.    Standing to Assert Religious Injury

Although Defendants do not address the issue, a federal court may raise a plaintiff's Article III standing *sua sponte*. *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007). To be entitled to sue in federal court, a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be "fairly traceable" to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

In a decision in a prior case also involving First Amendment and RLUIPA claims by another NOGE adherent, *Carter v. Heyns*, No. 1:16-cv-1279, 2022 WL 4591498 (W.D. Mich. Sept. 30, 2022), this Court held that the plaintiff failed to establish standing to assert religious injury under either the First Amendment or RLUIPA because, "throughout the record, Plaintiff asks that NOGE be treated as 'equivalent to' a religion." *Id.* at *2.[4] The Court further noted that the plaintiff's written request for accommodations specifically proclaimed that NOGE "is 'NOT a religion.'" *Id.* (emphasis in original). The Court reasoned that the plaintiff's characterization of NOGE as something other than a religion precluded standing to assert a religious injury:

> He is asking to be extended the same treatment as recognized religions without being a religion. To the extent that Plaintiff claims a non-religious injury that he asks be treated the same as a religious one, an equal protection claim also fails. MDOC may treat non-religious groups differently than religious ones because both the First Amendment and RLUIPA rely on those categories. Just because a group of prisoners shares a common interest—even a deeply held one—in economics, philosophy, or chess does not entitle them to protection afforded religious groups under either the Free Exercise Clause or RLUIPA. Therefore, even if NOGE could theoretically qualify for those protections, where, as here, a Plaintiff expressly and repeatedly denies having any religious injury, they lack standing to sue.

*Id.*

Here, as in *Carter*, Lopp repeatedly asserts that NOGE is a culture rather than a religion and requests the MDOC to extend "the same protection [for NOGE] you afford to religious groups." (ECF No. 117-6 at 897.) In his submissions, Lopp specifically affirmed that "[t]he NOGE eschew the term religion[.]" (ECF No 127-2 at PageID.1180.) His request was for "cultural recognition," (*id.*), and asserted that adherents "prefer the term culture" rather than religion. (*Id.* at PageID.1182.) The materials Lopp submitted to support his recognition requests also confirmed that NOGE had been "mis-defined as a religion" but still is "equivalent to any mainstream

---

[4] Lopp had been a plaintiff in *Carter* but was dismissed from the action for lack of prosecution/failure to comply with an order of the Court. Case No. 1:16-cv-1279, ECF No. 50.

religion." (*Id.* at PageID.1170.) In short, like the plaintiff in *Carter*, Lopp's disclaimer of religious injury precludes standing for his free exercise clause and RLUIPA claims. *See Thomas v. Review Bd. of Ind Emp't Sec. Div.*, 450 U.S. 707, 713 (1981) ("Only beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion.").

### B.    Constitutional Claims

Defendants contend that they are entitled to qualified immunity on all of Lopp's constitutional claims. The doctrine of qualified immunity provides that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999). An "objective legal reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The qualified immunity inquiry requires a court to decide whether the facts as alleged or shown make out a constitutional violation and whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If the court can conclude either that no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either prong of the inquiry without regard to sequence. *Id.* at 236.

The second prong of the qualified immunity analysis focuses on the state of the law at the time the alleged violation occurred. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing

precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). It is not enough to show that the right is established at "'a high level of generality.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* at 993 (quoting *White*, 580 U.S. at 79). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019). "An official's conduct flunks this 'clearly established' test only if the conduct's unconstitutionality was 'beyond debate' when the official acted, such that any reasonable person would have known that it exceeded constitutional bounds." *DeCrane v. Eckart*, 12 F.4th 586, 599 (6th Cir. 2021). To determine whether a right is clearly established, a district court within the Sixth Circuit may consider binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point. *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (quoting *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002)).

### 1.    Free Exercise Claims

#### a.    Defendant Hollingsworth

Defendants contend that Lopp's free exercise claim against Hollingsworth fails because, as a Chaplain, Hollingsworth simply conducted the interview required for religious (vegan) diet requests and forwarded that information to SAC Adamson or Dirschell, who were the decisionmakers by policy. (ECF No. 127 at PageID.134–35.) Defendants also note that Hollingsworth was not responsible for approving alternative diet requests or religious recognition

requests. They contend that Hollingsworth lacked personal involvement in any decisions because he simply passed information along to the decisionmakers, responded to Lopp's requests for status updates, and informed Lopp of expected policy changes. (*Id.* at PageID.1134–35.)

Lopp responds that Hollingsworth had the requisite personal involvement because he set in motion the events leading to denial of Lopp's requests by noting that his religious preference was "Unknown" and that he claimed NOGE as his practicing religion, which was not a recognized religious group. (ECF No. 136 at PageID.1555–56.) Lopp further argues that Hollingsworth violated his free exercise rights by telling Lopp that if he changed his religious preference, he would get the meals that he wanted. (*Id.* at PageID.1555; ECF No. 131-31 at PageID.1480.) Lopp argues that his requests were denied after he defied Hollingsworth's pressure to change his religious preference.

Hollingsworth denies telling Lopp that he would be approved for religious meals if he changed his religious preference because he is not the decisionmaker regarding religious meals and cannot guaranty approval of a request, regardless of the applicant's designated religion. (ECF No. 127-8 at PageID.1255–56.) Hollingsworth claims that he did tell Lopp that his religious preference in the system was "No Preference" and that policy allowed religious meals only if necessary for the prisoner's "designated" religion, but that Lopp could still apply and Hollingsworth would still process his requests as required by policy. (*Id.* at PageID.1256.)

While Lopp has shown that Hollingsworth was sufficiently involved in his religious diet requests by gathering information and making recommendations, Lopp fails to demonstrate that Hollingsworth's acts violated the constitution or clearly established law. Accepting Lopp's version of events, Hollingsworth did not violate his rights by simply suggesting that Lopp would be approved for religious meals if he changed his religious designation. It is undisputed that Lopp did

not change his religious designation. More importantly, the specific policy provision states that a religious diet request "shall be granted only if it is necessary to the practice of the prisoner's designated religion[.]" Mich. Dep't of Corr. Policy Directive 05.03.150 ¶ PP. Because NOGE was not a recognized religion and Lopp's designated religion was "Unknown," the policy itself precluded granting Lopp's requests. Hollingsworth did not violate Lopp's clearly established rights simply by telling Lopp that his religious meal requests stood a better chance of being granted if he changed his religious designation, or by indicating to Adamson or Dirschell that policy precluded Lopp's religious diet request based on his "Unknown" designation. Even if mistaken, Hollingsworth's statements were based on a reasonable interpretation of MDOC's policy and did not violate Lopp's clearly established rights. Thus, Defendant Hollingsworth is entitled to qualified immunity.

### b.    NOGE Recognition Requests

Lopp contends that Defendants violated his free exercise rights by denying his requests to recognize NOGE for purposes of allowing it to congregate weekly, celebrate NOGE honor days, and possess authorized religious property.

It is well established that a prisoner does not forfeit all of his constitutional rights, including his right to free exercise of religion. *See Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (stating that "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty"). To demonstrate that his right to freely practice his religion was violated, Lopp must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) his belief is sincerely held, and (3) Defendants' behavior infringes upon his practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987). Defendants do not dispute the sincerity of Lopp's beliefs.

15

Notwithstanding these rights, it is well established that incarceration legitimately requires restrictions on many rights and privileges that prisoners retain. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

> [S]uch a standard is necessary "if prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. North Carolina Prisoners' Union*, 433 U.S. [119,] 128, 97 S. Ct. [2532, 2539 (1977)]. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S. [396], 407, 94 S. Ct. [1800, 1808 (1974)].

*Turner v. Safley*, 482 U.S. 78, 89 (1987). In other words, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations," *Bell v. Wolfish*, 441 U.S. 520, 545 (1979), as operating a prison is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85.

In *Turner*, the Court articulated four factors to assess the reasonableness of a prison regulation: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact accommodation of the asserted constitutional right will have on prison staff and inmates; and (4) whether there are other readily available alternatives at a de minimis cost to valid penological interests. *Id.* at 89–91. This standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional

16

complaint." *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001) (quoting *Turner*). Instead, the issue is simply whether the policy at issue is reasonably related to a legitimate penological interest. *Id.* A plaintiff must show that the regulation, as applied by each Defendant, was not reasonably related to legitimate penological objectives. *Murphy v. Karber*, No. 1:14-cv-269, 2017 WL 4160949, at *13 (W.D. Mich. Sept. 20, 2017) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.")).

Although Lopp contends that Defendants had no legitimate basis to deny his requests to recognize NOGE, Defendants have identified two legitimate penological interests supporting a denial of Lopp's recognition requests. First, NOGE's history as an STG and its core teachings that black men are Gods and white men are the devil presented legitimate security concerns due to racial doctrine that would exclude white prisoners from services because they were the devil. (ECF No. 117-6 at PageID.906.) Second, Defendants had concerns about precedent that would be set by approving a group for religious services and activities even though the group denied being religious and identified itself as a "culture" and "way of life." (*Id.*; ECF No. 127-7 at PageID.1249–50; ECFD No. 128-1 at PageID.1294 (noting "legitimate concerns about how things would go in the future[] if the MDOC started providing religious recognition to groups who said they were not a religion").)

Lopp disputes the legitimacy of these concerns and points to evidence he says refutes them. First, he notes that the "religious" label requirement is not set forth in policy and was not applied to other groups. Lopp also claims that Defendants concern about the consequences of recognizing a culture or non-religious organization to hold religious services and activities arose two decades ago when the MDOC recognized the Yoruba culture under the religious policy. (ECF No. 136 at

17

PageID.1544.) Yet Lopp cites no evidence that Yoruba is not, in fact, a religion or that it is not both a distinct culture and a religion.[5] *See Martin v. MacLaren*, No. 2:14-cv-208, 2016 WL 11476992, at *1 (W.D. Mich. June 22, 2016), *report and recommendation adopted*, 2016 WL 4445372 (W.D. Mich. Aug. 24, 2016) (noting that the plaintiff practiced the Yoruba religion). As for security concerns, Lopp contends that Defendants were well aware that NOGE was also open to white adherents as early as 2020, when Hollingsworth sent a request from Lopp and a white prisoner, Wise, to Adamson. (ECF No. 136 at PageID.1545.) But nothing in the exhibit Lopp cites (ECF No. 136-4), indicates that Wise was a NOGE adherent. In any event, at a minimum, the MDOC's concern about recognition of a group that expressly affirms it is not religious is a legitimate penological concern, especially given that the MDOC already cannot approve every recognition request from groups claiming to be religious. (ECF No. 128-1 at PageID.1293–94.) Such a policy could place increased demands on already overburdened correctional staff. Moreover, Lopp has not identified any readily available alternative. Accordingly, the *Turner* factors weigh in favor of Defendants, and no genuine issue of material fact remains as to whether Defendants Adamson, Dirschell, and Bush infringed on Lopp's practices or beliefs.

Defendants also did not violate clearly established law. When a Defendant asserts a viable claim to qualified immunity, the burden shifts to the plaintiff "to demonstrate both that the challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (quoting

---

[5] In support of his motion for summary judgment, Lopp cites former Deputy Director McKee's deposition testimony in *Byrd v. Haas, et al.*, No. 2:17-cv-11427 (E.D. Mich.) for the proposition that Yoruba adherents describe their ethnic tradition as a "way of life." In fact, throughout the deposition, Yoruba is referred to as a religion. (ECF No. 131-22 at PageID.1422–27.)

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Lopp fails to cite any binding case law clearly establishing that Defendants were required to recognize NOGE for purposes of group religious services. The Supreme Court has not addressed the issue, and the most recent decision from the Sixth Circuit discussing NOGE in the context of prison administration is *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105 (6th Cir. May 5, 2010), which affirmed the MDOC's designation of NOGE as an STG "because it holds racial supremacist views and has been linked to violence and gang-related activity in other prison systems." *Id.* at *2 (citing *Fraise v. Terhune*, 283 F.3d 506, 516–21 (3d Cir. 2002)). Other courts have recognized the absence of case law clearly establishing that NOGE is a religion. *See Greene v. Lassiter*, No. 1:19-cv-224, 2025 WL 320947, at *13 (W.D.N.C. Jan. 28, 2025) ("While the NGE has now been recognized in some instances as a religion, and not an SRG, neither the Fourth Circuit nor the Supreme Court has clearly established the constitutional right of Five Percenters to practice the NGE in prison. On the contrary, the Fourth Circuit has generally declined to consider whether the NGE is a religion and has frequently affirmed the denial of prisoner claims brought under the more protective RLUIPA."); *Allah v. DePaolo*, No. 17-CV-6313 (KMK), 2019 WL 1367608, at *8 (S.D.N.Y. Mar. 26, 2019), *opinion vacated in part on reconsideration*, No. 17-CV-6313 (KMK), 2019 WL 1649021 (S.D.N.Y. Apr. 4, 2019) (granting qualified immunity because neither the Second Circuit nor the Supreme Court had recognized NOGE as a religion).

Lopp's citation of the Court's statement in its October 21, 2021 order in *Carter v. Heyns*, 1:16-cv-1279, 2021 WL 9527652 (W.D. Mich. Oct. 21, 2021), that "the trend the Court sees in the case law is to find a NOGE practitioner's beliefs to be 'sufficiently religious in nature' such as to be entitled to protection [under the Free Exercise Clause and RLUIPA]," is insufficient to give Defendants fair notice that they were required to recognize NOGE as a religion for purposes of

Policy Directive 05.03.150. The Court did not enter a judgment in *Carter* holding that NOGE is a religion or requiring the MDOC to recognize NOGE as a religion. In fact, in its September 30, 2022 order, the Court stated that "Defendants were not on notice that enforcing MDOC policy [by declining to grant the plaintiff's NOGE recognition request] would be violating anyone's rights or breaking any law." 2022 WL 4591498, at *2. This is not a statement that would clearly establish the law. Thus, Defendants are entitled to qualified immunity on this claim.

### c.      Religious/Alternative Diet Requests

As set forth above, Lopp made several separate, alternating requests for the religious (vegan) diet and alternative meals between 2019 and 2023. In his complaint, Lopp alleges that he requested the religious vegan meal on or about January 1, 2020 because his sincere NOGE belief requires him "to eat a soy-free lacto-ovo vegetarian diet[.]" (ECF No. 68 at PageID.444.) Similarly, in his brief in support of his motion for summary judgment, Lopp affirms that he requires a "soy-free lacto-ovo vegetarian meal[.]" (ECF No. 131 at PageID.1336–37.) Of course, a lacto-ovo vegetarian diet is inconsistent with a vegan diet.[6] Thus, by his own admission, his beliefs did not require a vegan diet.[7]

---

[6]      *See*        https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/in-depth/vegetarian-diet/art-20046446 (last visited Feb. 19, 2026) (noting that a lacto-ovo vegetarian diet excludes "meat, fish and poultry, but allow[s] dairy products and eggs," while a vegan diet "exclude[s] meat, poultry, fish, eggs and dairy products, as well as foods that contain these products").

[7] Lopp also claims that Defendants failed to consider alternatives based on his alleged medical condition requiring him to avoid soy. (ECF No. 131 at PageID.1339.) But this argument speaks to the need for a therapeutic diet, not a religious diet. *See Dykes v. Corizon, Inc.*, No. 2:22-cv-113, 2024 WL 2732226, at *5 (W.D. Mich. Feb. 7, 2024), *report and recommendation adopted*, 2024 WL 2717390 (W.D. Mich. Feb. 7, 2014) (noting that in assessing requests for religious and alternative diets, the SAC and Deputy Director "are concerned only with the individual's sincere religious beliefs" rather than "the medical needs of the individual requesting the alternative diet"). On this issue, Lopp has sued the wrong individuals.

In any event, it is undisputed that Lopp's religious diet requests were denied on a number of grounds, including that (1) Lopp did not have a "designated" religion that required a special religious meal because NOGE was not recognized as a religion within the MDOC; (2) Lopp's submissions consistently stated that a vegetarian diet was required or preferred; and (3) his food purchases were inconsistent with his religious diet requests. (ECF No. 117-6 at PageID.883, 885, 889; ECF No. 127-7 at PageID.1250–51; ECF No. 128-1 at PageID.1292–93; ECF No. 127-11.)

As for his commissary purchases, Lopp contends that Defendants have not shown that he actually consumed any of the prohibited foods that he purchased, and they fail to acknowledge the prison economy where prisoners barter food for other items or services. (ECF No. 136 at PageID.1549.) But as explained in *Dykes v. Corizon, Inc.*, No. 2:22-cv-113, 2024 WL 2732226 (W.D. Mich. Feb. 7, 2024), *report and recommendation adopted*, 2024 WL 2717390 (W.D. Mich. May 28, 2024), "[t]his Court has consistently determined that '[i]t is reasonable for prison officials to deny special religious diets to prisoners who consume *or purchase* food which is inconsistent with the requested religious diet.'" *Id.* at *12 (italics in original) (collecting cases); *see also O'Connor v. Leach*, No. 1:18-cv-977, 2020 WL 838084, at *3, (W.D. Mich. Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 2187814 (W.D. Mich. May 6, 2020) ("[E]ven had Leach been aware that Plaintiff was purchasing non-kosher food for trade rather than consumption, such still constitutes a legitimate basis for denying Plaintiff's request to participate in a kosher meal program."); *Perreault v. Mich. Dep't of Corrs.*, No. 1:16-cv-1447, 2018 WL 3640356, at *3 (W.D. Mich. Aug. 1, 2018) ("It is reasonable for prison officials to deny special religious diets to

prisoners who consume or purchase food which is inconsistent with the requested religious diet.")

(citing *Berryman v. Granholm*, 343 F. App'x 1, 6 (6th Cir. 2009)).[8]

It is well established that prison officials have a legitimate penological interest in controlling the cost of special religious diets. *See, e.g., Green v. Tudor*, 685 F. Supp. 2d 678, 698 (W.D. Mich. 2010) (recognizing that the State of Michigan "expends significant financial and administrative resources" providing prisoners with religious diets that are "expensive, diverting resources from other penological goals"). In addition, prison officials have "a legitimate interest in maintaining discipline within the prison, and '[p]ermitting a prisoner to participate in a religious diet program when he is consuming or purchasing food in violation of the tenets of his stated religion could negatively impact prison security as such could cause resentment among prisoners who adhere to their faith's dietary restrictions.'" *Dykes*, 2024 WL 2732226, at *12 (quoting *O'Connor*, 2020 WL 838084, at *3).

On balance, the *Turner* factors support the conclusion that Defendants did not violate Lopp's free exercise rights. As noted, Defendants have legitimate penological interests in controlling costs and maintaining discipline within the prison relative to religious diets.

---

[8] Lopp cites an unpublished order from the Sixth Circuit in *Ewing v. Finco*, No. 20-1012/1022, Order (6th Cir., Jan. 5, 2021), which rejected this approach because the plaintiffs lacked notice that their store purchases could be used as a basis for denying their religious meal requests. In *Ali v. Adamson*, No. 1:21-cv-71, 2023 WL 9382485 (W.D. Mich. Dec. 12, 2023), *report and recommendation adopted*, 2024 WL 277517 (W.D. Mich. Jan. 25, 2024), the court stated that the unpublished order in *Ewing* "called into question" this approach as of the date of the order. *Id.* at *5. Although Lopp does not cite *Ewing* for this purpose, under well-established Sixth Circuit precedent, the unpublished order in *Ewing* cannot clearly establish the law for purposes of qualified immunity. *See Bambach v. Moegle*, 92 F.4th 615, 627 (6th Cir. 2024) (noting that "an unpublished case cannot clearly establish the governing law") (citing *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022) (noting that all of the plaintiff's cases were "either out-of-circuit or unpublished, and thus do not clearly establish anything as to the officers")). Thus, Defendants were entitled to rely on the law established by the Sixth Circuit and this district prior to the date of the *Ewing* order, which allowed them to consider Lopp's food purchases in evaluating his religious/alternative diet requests.

Consideration of a prisoner's store purchases is a reasonable means to determine whether the prisoner the has a legitimate need for a religious meal. The remaining factors do not overcome Defendants' legitimate interest. Although Lopp claims that he cannot rely on the vegetarian diet due to the presence of soy, "[Lopp] can supplement his veg[etarian] meals with food from the commissary that adheres to his beliefs." *Id.* at *12. In fact, given his judicial admission that his religious diet is lacto-ovo vegetarian, there is no reason that Lopp cannot purchase cheese and other dairy items to consume in place of soy on days it appears on the vegetarian menu. In addition, it is undisputed that Lopp was permitted to reapply for the religious diet once per year.

Finally, to the extent Defendants denied Lopp's requests on the basis that NOGE was not a recognized religion, Defendants are entitled to qualified immunity for the reasons set forth in *Lopp v. Washington*, No. 1:19-cv-540, 2022 WL 20157183, at *3 (W.D. Mich. Feb. 10, 2022), *report and recommendation adopted*, 2022 WL 1498128 (W.D. Mich. May 12, 2022).

Therefore, I recommend that Defendants be granted summary judgment on Lopp's religious/alternative meal claim.

### d.    NOGE Literature

Lopp alleges that Defendants categorically ban materials central to NOGE (ECF No. 68 at PageID.447), but the MDOC's decision to remove *The Wu-Tang Manual* from the Restricted Publications List clearly shows that this allegation is not true. Nonetheless, Lopp contends that Defendants—here, only Defendant Bush, as the official responsible for determining whether a publication should be placed on the Restricted Publications List—violated his free exercise rights by placing and keeping *The Five Percenters* and *How to Hustle and Win: A Survival Guide for the Ghetto* on the Restricted Publications List.

I return to the familiar *Turner* framework. *The Five Percenters* was placed on the Restricted Publications List on April 11, 2019 because it "[i]ncludes language which is used to promote racial superiority and to attack other racial and ethnic groups." *How to Hustle and Win: A Survival Guide for the Ghetto* was placed on the Restricted Publications List on August 2, 2021 because it "[p]rovides direction in how to carry out scams to defraud individuals of money; this book includes content which may facilitate criminal activity." *See* https://www.michigan.gov/corrections/public-information/restricted-publications (last visited Feb. 20, 2026).

Here, Defendants have established a legitimate penological interest in preventing prisoner access to a book that promotes racial superiority or attacks other racial and ethnic groups as such content can inflame tensions among prisoners and promote violence. *See Winburn v. Bologna*, 979 F. Supp. 531, 534 (W.D. Mich. 1997) ("The mail regulation is logically related to legitimate security concerns of prison officials, who are worried that such material promotes violence and racial supremacy."). Defendants likewise have legitimate security concerns in preventing prisoner access to a book providing information about scams to defraud individuals for money and content that may facilitate criminal activity. Such is the antithesis of rehabilitation and also presents legitimate security concerns. *See Hardrick v. Nolani*, No. 2:20-cv-239, 2022 WL 18461625 (W.D. Mich. Dec. 28, 2022), *report and recommendation adopted*, 2023 WL 404295 (W.D. Mich. Jan. 25, 2023) (finding legitimate interest in preventing prisoners from accessing book containing techniques to manipulate and intimidate others).

The remaining *Turner* factors favor Defendants. As set forth above, Lopp has access to a significant collection of NOGE foundational materials, including Supreme Mathematics, Supreme Alphabet, and the 120 Lessons (ECF No. 128-1 at PageID.1295), and Lopp receives NOGE's national monthly newspaper. (ECF No. 117-6 at PageID.878, 888.) Lopp testified about using

24

these materials as well as "literature and texts from different cultural publications" to study NOGE's tenets. (ECF No. 127-3 at PageID.1214.) While Lopp may claim that both restricted books are essential to his NOGE beliefs, he already possesses the essential materials he needs and there are legitimate reasons to restrict these books. In addition, there exists no reasonable alternatives that could accommodate Lopp's desire to possess *The Five Percenters* and *How to Hustle and Win: A Survival Guide for the Ghetto*. *See Winburn*, 979 F. Supp. at 535 ("There is no easy alternative to barring such potential violence causing materials, since allowing such material into the prison population would cause more than a *de minimis* cost in terms of increasing security measures."). Finally, Lopp fails to show that lack of access to the foregoing books imposes a "substantial burden" on his observance of his NOGE beliefs—a "difficult threshold to cross." *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 736 (6th Cir. 2007). Lopp admittedly has access to the primary texts for his cultural studies.

In sum, because I conclude that there are no genuine issues of material fact, and Defendants did not violate Lopp's free exercise rights by maintaining the subject books on the MDOC's Restricted Publications List, Defendants are entitled to qualified immunity. Moreover, Lopp fails to cite any clearly established law that would have alerted Defendants that their actions violated Lopp's constitutional rights.

### 2.    Equal Protection/Theological Discrimination

I consider Lopp's equal protection and theological discrimination claims together as they both concern his allegation that Defendants discriminated against NOGE. Lopp alleges in his amended complaint that he is similarly situated "in all material respects to members of the Nation of Islam (N.O.I[.]), Christians, Jews and [B]uddist [sic] who are permitted to practice their religions by group worship, diets, and literature." (ECF No. 68 at PageID.455.) Lopp claims that

25

these groups are permitted to engage in these activities and possess these things, but NOGE adherents are not. (*Id.*)

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A state practice requires strict scrutiny if it interferes with a fundamental right or discriminates against a suspect class of individuals. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). An individual's right to the free exercise of religion is a fundamental right. *City of Cleburne*, 473 U.S. at 440. The threshold element of an equal protection claim, however, is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)). "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Village of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018).

Defendants are entitled to summary judgment on Lopp's equal protection claim because Lopp fails to present evidence that he was treated disparately as compared to another similarly situated prisoner. In response to Defendants' motion for summary judgment and in his own motion,

Lopp abandons his foregoing amended complaint allegations about being similarly situated to the Nation of Islam, Christians, Jews, and Buddhists. Lopp also fails to present any evidence, or even argument, that a similarly situated prisoner received more favorable treatment with respect to a religious diet request or restricted religious literature than Lopp.

Lopp's sole argument is that the Yoruba, which the MDOC recognized in 2005, is similarly situated to the NOGE because the Yoruba believe their religion is a way of life. (ECF No. 131 at PageID.1331, 1343.) But the Yoruba and the NOGE are not similarly situated. The Yoruba was a recognized religion within the MDOC and the NOGE was not (at least until 2024). Thus, the two groups are not similarly situated. *See Spearman v. Michigan*, No. 20-1476, 2020 U.S. App. LEXIS 40577, at *13 (6th Cir. 2020) ("Spearman made no showing that he was treated differently from other prisoners who also practice a religion not formally recognized by the MDOC."). Furthermore, even if Lopp's comparison is the Yoruba before MDOC recognition, Lopp offers no evidence as to how the Yoruba presented themselves to the MDOC for formal recognition. While the NOGE presented themselves as a culture, not a religion, there is no evidence in the record that the Yoruba did the same thing. Accordingly, Lopp fails to establish an equal protection/theological discrimination claim.

### C.    RLUIPA Claim

Lopp seeks to revisit whether damages may be recovered under RLUIPA. The Court addressed the issue on initial screening and held that RLUIPA does not create a cause of action against an individual in that individual's personal capacity and does not permit damage claims against prison officials in their official capacities. (ECF No. 7 at PageID.73–74.) This ruling covered the waterfront of potential damage claims.

Lopp's effort to revive the issue is barred by the law-of-the-case doctrine. The law-of-the-case doctrine provides that, absent extraordinary circumstances, a court should refrain from reconsidering issues that were decided at an earlier stage of the same litigation. *See United States v. Tocco*, 306 F.3d 279, 288 (6th Cir. 2002). "The law of the case doctrine generally discourages courts from reconsidering determinations that the court made in an earlier stage of the proceedings." *United States v. Graham*, 327 F.3d 460, 464 (6th Cir. 2003). In order for the doctrine to apply, however, a court must have decided the issue explicitly or by necessary implication. *See Bowles v. Russell*, 432 F.3d 668, 676-77 (6th Cir. 2005). The doctrine is discretionary when applied to the same court's own decisions. *See id.* at 677 (quoting *Bowling v. Pfizer, Inc.*, 132 F.3d 1147, 1150 (6th Cir. 1998)). The doctrine applies here because the Court explicitly considered the issue of damages under RLUIPA.

Lopp suggests that the Court should consider whether damages are available under RLUIPA's Commerce Clause authority. But in *Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014), the Sixth Circuit held that the "clear-statement rule" precluded RLUIPA damages under both Congress's Spending and Commerce Clause powers. *Id.* at 569–70; *see also Mease v. Washington*, No. 2:20-cv-176, 2021 WL 1921071, at *15 (W.D. Mich. May 13, 2021) (stating that "the *Haight* court held that the federal statutes enacted under the Commerce Clause, like those enacted under the Spending Clause, require a clear statement of Congress' intent"). Moreover, Lopp ignores the Sixth Circuit's recent decision in *Ali v. Adamson*, 132 F.4th 924 (6th Cir. 2025), which affirmed that "RLUIPA does not authorize damages against officials sued in their official capacity, or their individual capacity[.]" *Id.* at 930 (citations omitted). The *Ali* court further concluded that the Supreme Court's decision in *Tanzin v. Tanvir*, 592 U.S. 43 (2020)—which Lopp cites—did not

abrogate *Haight*. *Id.* at 931–32. In short, Lopp provides no persuasive reason to revisit the prior ruling on damages under RLUIPA.

As for declaratory and injunctive relief, which is available under RLUIPA, it is moot in light of Lopp's recent parole from the MDOC on February 3, 2026. *See Warner v. Patterson*, 534 F. App'x 785, 788 (10th Cir. 2013) ("A prisoner's release from or transfer out of a prison system generally moots claims for declaratory and injunctive relief for claims concerning conditions in that system."); *Pasaye v. Nevada*, No. 2:17-cv-2574, 2020 WL 2105024, at *8 (D. Nev. May 1, 2020) ("Pasaye's proposed amendment to add the State of Nevada and NDOC as parties to support his claim for declaratory relief under RLUIPA would be futile. As explained above, he has been paroled and this changed condition moots his request for declaratory relief."); *Beebe v. Birkett*, 749 F. Supp. 2d 580, 588 (E.D. Mich. 2010) (prisoner's request for injunctive and declaratory relief under RLUIPA was moot in light of his parole from the MDOC); *Pugh v. Goord*, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) (holding that the plaintiff's RLUIPA claims for injunctive relief were moot due to the plaintiff's release from prison).

Accordingly, Lopp no longer may obtain injunctive or declaratory relief under RLUIPA.

### D.    Lopp's Motion for Summary Judgment

Based on the foregoing analysis, including Lopp's inability to overcome Defendants' entitlement to qualified immunity on the constitutional claims, I recommend that the Court deny Lopp's motion for summary judgment as he has not met his burden of demonstrating entitlement to relief.

### IV.    Conclusion

For the foregoing reasons, I recommend that the Court **grant** Defendants' motion for summary judgment (ECF No. 126), **deny** Lopp's motion for summary judgment (ECF No. 130), and terminate this action.


Dated: February 23, 2026                                  /s/ Sally J. Berens
                                                              SALLY J. BERENS
                                                              U.S. Magistrate Judge

### <u>NOTICE TO PARTIES</u>

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).